HARDIN SIGN COMPANY, Appellant, v. INDUSTRIAL COMMISSION *et al.* (James T. Hughes, Appellee).

Third District (Industrial Commission Division)   No. 3—86—0373WC

Opinion filed April 15, 1987.

Robert H. Jennetten, of Peoria, for appellant.

R. Wayne Harvey, of Harvey & Stuckel, Chartered, of Peoria, for appellee.

JUSTICE KASSERMAN delivered the opinion of the court:

Claimant, James T. Hughes, filed an application for adjustment of claim under the Workmen's Compensation Act (Act) (Ill. Rev. Stat. 1977, ch. 48, par. 138.1 *et seq.*) for an injury to his left arm which he alleges arose out of and in the course of his employment with Hardin Sign Company (Hardin). After a hearing before an arbitrator on December 11, 1978, claimant was awarded temporary total disability in the amount of $231.42 per week for 82 weeks (Ill. Rev. Stat. 1979, ch. 48, par. 138.8(b)), reasonable and necessary medical expenses (Ill. Rev. Stat. 1979, ch. 48, par. 138.8(a)), and $231.42 per week for 211½ weeks for a 90% permanent disability of the left arm, payable in installments (Ill. Rev. Stat. 1979, ch. 48, par. 138.8(e)). On February 27,

1980, the Industrial Commission reduced the permanent disability award from 90% to 75% (*i.e.*, $231.42 per week for 176¼ weeks, payable in installments) but otherwise affirmed the arbitrator's award. No judicial review of this original award was sought.

On August 5, 1980, claimant filed a petition for additional benefits pursuant to section 19(h) (Ill. Rev. Stat. 1979, ch. 48, par. 138.19(h)). In a decision issued on May 24, 1982, the Industrial Commission awarded claimant an additional 9⁶/₇ weeks of temporary total disability benefits and additional reasonable and necessary medical expenses. Additional permanent partial disability compensation was denied. No judicial review of this award was sought.

On January 18, 1983, claimant filed a second petition for additional benefits pursuant to section 19(h). Although this filing date was more than 30 months after the Industrial Commission's original award on February 27, 1980, the Industrial Commission found the petition to have been timely filed in relation to the Industrial Commission's decision entered on claimant's first section 19(h) petition on May 24, 1982. The Industrial Commission found, however, that claimant's second petition failed to establish any entitlement to additional compensation.

On November 30, 1984, the circuit court reviewed this decision and found it to be contrary to the manifest weight of the evidence. The circuit court ordered (1) that the Industrial Commission determine the amount of increase of disability the claimant had incurred since February 27, 1980, and (2) that the amount of the permanent disability award be increased accordingly. On remand, the Industrial Commission found claimant's permanent disability to have increased from 75% to 90%. After the circuit court confirmed this award, Hardin perfected the instant appeal to this court. On appeal Hardin urges that: (1) claimant's second section 19(h) petition was untimely, and (2) alternatively, the trial court erred in finding that the Industrial Commission's denial of increased benefits pursuant to such petition was contrary to the manifest weight of the evidence.

Section 19(h) provides in pertinent part:

> "(h) An agreement or award under this Act providing for compensation in installments, may at any time within 18 months after such agreement or award be reviewed by the Commission at the request of either the employer or the employee, on the ground that the disability of the employee has subsequently recurred, increased, diminished or ended.

> However, as to accidents occurring subsequent to July 1, 1955, which are covered by any agreement or award under this Act providing for compensation in installments made as a result

of such accident, such agreement or award may at any time within 30 months after such agreement or award be reviewed by the Commission at the request of either the employer or the employee on the ground that the disability of the employee has subsequently recurred, increased, diminished, or ended.

On such review, compensation may be re-established, increased, diminished, or ended. \*\*\*

When compensation which is payable in accordance with an award or settlement contract approved by the Commission, is ordered paid in a lump sum by the Commission, no review shall be had as in this paragraph mentioned." (Ill. Rev. Stat. 1979, ch. 48, par. 138.19(h).)

Hardin contends that claimant's January 18, 1983, petition for review of the permanent disability award was not timely filed because the award of temporary total disability entered on the first section 19(h) petition was not an "award" within the meaning of section 19(h). Hardin urges that as a consequence, the award was not subject to review under section 19(h). Moreover, Hardin asserts that the Industrial Commission's previous finding of no increased permanent disability should preclude the filing of a second section 19(h) petition. Claimant contends, and the Industrial Commission determined, that the award of additional temporary total disability and medical expenses sought by claimant and awarded by the Industrial Commission on May 24, 1982, was a new "award" and, thus, created a new date from which the 30-month limitation period provided in section 19(h) would begin to run. In answer to Hardin's assertion that claimant should be allowed to file only one section 19(h) petition, claimant contends that not allowing more than one section 19(h) petition in a 30-month period would violate the equal protection clause.

The Workers' Compensation Act is a humane law of a remedial nature. (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 181, 384 N.E.2d 353, 357.) The underlying purpose of the Act is to provide financial protection for workers whose earning power is interrupted or terminated as a consequence of injuries arising out of and in the course of their employment. *Board of Education v. Industrial Com.* (1972), 53 Ill. 2d 167, 171, 290 N.E.2d 247, 249.

Remedial legislation should be construed liberally to effectuate its purposes. (*S. N. Nielsen Co. v. Public Building Com.* (1980), 81 Ill. 2d 290, 298, 410 N.E.2d 40, 44.) Since section 19(h) seeks to redress changes in circumstances after the entry of a compensation award payable in installments, it is particularly remedial in nature and should be construed liberally so as to allow review of alleged changes

in circumstances. In the first section 19(h) petition, claimant sought additional total temporary disability compensation as well as additional medical and incidental expenses because he was experiencing recurrent difficulty from his original injury. After a hearing, the Industrial Commission found a change in circumstances and increased the original award so as to include the additional benefits requested. In this regard, it is our conclusion that section 19(h) of the Act mandates that additional review of an award be encouraged so as to effectuate the purpose and spirit of the Act. Furthermore, such method of determination of a claimant's disability eliminates the most difficult problem of attempting to anticipate the progress of a claimant's disability and making a somewhat speculative award to him to cover anticipated increases or decreases in disability. We therefore conclude (1) that no party should be barred from filing more than one section 19(h) petition during the appropriate time limitation, and (2) that the 30-month time limitation provided for in section 19(h) should begin anew from the date of the Industrial Commission's decision on the first section 19(h) petition. Consequently, claimant's second section 19(h) petition was properly and timely filed.

The trial court determined that the Industrial Commission's decision to deny claimant additional permanent benefits for his original injury, entered on claimant's second section 19(h) petition, was contrary to the manifest weight of the evidence. We must now determine whether this finding was erroneous. The following evidence was adduced relative to this issue.

### MEDICAL EVIDENCE EXISTING PRIOR TO FEBRUARY 27, 1980

On December 6, 1976, claimant, a sheet metal worker, fell from a ladder while welding a steel stairway for Hardin. He sustained a comminuted fracture of the distal portion of the left radius and ulna involving the left wrist joint and an undisplaced fracture of the left carpal navicular bone. Dr. Albert J. Novotny, an orthopedic surgeon, treated these fractures with reduction and an external skeletal fixation device. After removal of this device, a cast was applied to claimant's left arm.

Post-operatively, claimant developed reflex sympathetic dystrophy (*i.e.*, pain, coldness, possible decreased blood circulation), which resulted in marked swelling of the hand and stiffness of the fingers. An April 21, 1977, letter from Dr. Novotny stated that reflex sympathetic dystrophy "commonly leads to prolonged weakness, hypersensitivity, swelling and stiffness which is very slow to subside. In addition, it often leaves permanent loss of motion in the involved extremity." Although loss of range of motion in the shoulder and elbow was minimal,

claimant complained of pain from his left shoulder down to his finger-tips. Claimant stated that the pain was most noticeable when the weather was cold. He further stated that his left hand becomes purple in color and starts jumping and quivering when it gets cold.

After his final examination of claimant on August 30, 1978, Dr. Novotny informed Hardin's counsel of the following:

"Examination reveals 4 centimeters atrophy of the left arm and 2 centimeters atrophy of the left forearm as compared to the right. The patient is right handed. The left wrist is somewhat thickened as compared to the right. Range of motion in the shoulder and elbow are normal. Forearm pronation is 70 degrees on both sides but supination is 70 degrees on the left as compared to 90 degrees on the right. Wrist dorsal flexion is 20 degrees on the left and 60 degrees on the right. Wrist palmar flexion is 40 degrees on the left and 70 degrees on the right. There is persistent loss of motion in the fingers of the left hand. Total flexion is 240 degrees as compared to a normal 270 degrees. There are 20 degree flexion contractures of the index, middle and ring fingers and a 70 degree flexion contracture of the small finger. Hand grip is weakened. There is still some sensory alteration in the left hand though sensation is intact.

No further treatment is necessary in this case. Mr. Hughes has been working but I am not sure exactly when he returned to work. His condition at this time is permanent and represents significant permanent/partial disability of his left arm."

After examining claimant on July 25, 1979, Dr. Richard Cram, an orthopedic surgeon, informed claimant's counsel of the following:

"Examination of the left upper extremity revealed the patient held his hands in a clawed position with moderate tapering of the contour of the fingers compaired [sic] to the normal hand. There was also thenar and hypothenar atrophy. Pronation of the left forearm was 60° with supination to 70°, there was no radial deviation at the wrist and only 20° of the ulnar deviation, there was 70° of wrist flexion with only 30° of extension. The left forearm measured 11¼ in circumference compared to 11¾" on the right, when measured 4" distal to the olecranon. There was full flexion of all finger joints but the 2nd finger lacked 10° extension at the PIP joint, the 3rd lacked 10°, the 4th lacked 30° and the 5th lacked 70° of passive extension at the proximal interphalangeal joint. The 2nd finger lacked 20°, the 3rd finger lacked 10°, the 4th finger lacked 10° and the 5th finger also lacked 10° of extension at the distal interphalangeal joint."

MEDICAL EVIDENCE FROM FEBRUARY 27, 1980, THROUGH MAY 24, 1982

On August 5, 1980, claimant filed his first section 19(h) petition, seeking additional temporary total disability, medical payments, lost wages, and expenses. Specifically, claimant went to the Mayo Clinic in Rochester, Minnesota, where Dr. R. D. Corley performed a release of left carpal tunnel on May 14, 1980. This operation was designed to reduce the pain and improve the function of claimant's left hand. Claimant testified that this operation failed to improve his condition. After reviewing the evidence, the Industrial Commission awarded additional temporary total disability and reasonable and necessary medical expenses. The Industrial Commission also found that claimant was not entitled to further permanent disability compensation; however, such benefits had not been requested by claimant.

MEDICAL EVIDENCE FROM MAY 24, 1982, THROUGH APRIL 19, 1984

At the hearing on the second section 19(h) petition, claimant testified that his left arm and hand had deteriorated since 1981. Moreover, the pain he experienced since the injury had not relented.

During an evidence deposition conducted on June 6, 1983, Dr. Douglas Collins, a neurologist, testified that he had been treating claimant's left arm and hand since May 1981. During this time, Dr. Collins formed the opinion that claimant's condition was worsening. Specifically, Dr. Collins noticed changes in claimant's joints and increased discoloration (bluishness) in claimant's left hand. Dr. Collins also noted that the skin on claimant's left hand had atrophied to a significant degree during the time claimant was treated. Dr. Collins believed that these conditions were primarily caused by reflex sympathetic dystrophy and that claimant's condition would continue to worsen even if corrective surgery (thoracic sympathectomy) were performed.

Dr. Collins apparently based his opinion on the following empirical data: (1) flexion of the left wrist was 30°; (2) dorsiflex (extension) of the left wrist was 15°; (3) dorsiflex (extension) of second, third, and fourth fingers was limited to 5° to 10°; dorsiflexion of the phlaxineal interphalangeal joint of the little finger was limited to 25°; (4) flexion of the second, third, and fourth fingers of the left hand was 10°; (5) claimant's left forearm was 6/16 of an inch smaller than right forearm. Since 1/4 of an inch is an acceptable deviation between the dominant (right) and nondominant (left) arm, Dr. Collins surmised that claimant's left forearm had atrophied 2/16 inch due to his condition. Dr. Collins admitted, however, that the deviation of 1/4 inch was a standard which could vary depending upon the individual; and (6) after it was

discovered that claimant had developed crepititus of the left shoulder, measurements were taken of the left shoulder and right shoulder at the deltoid and axilla. This measurement revealed that the left shoulder (14 inches) was one inch smaller than the right shoulder (15 inches).

During an evidence deposition conducted on June 15, 1983, Dr. Jay Alameda, an orthopedic specialist, testified that he examined claimant at Hardin's request in September 1980 and May 1983. After reviewing X rays taken on both occasions, Dr. Alameda concluded that the bones in the hand and wrist showed no signs of deossification. Furthermore, Dr. Alameda's 1983 examination revealed that while claimant's wrist flexion had improved since 1980, his wrist extension had worsened. Dr. Alameda's measurements of claimant's forearms and upper arms revealed that the left forearm and upper arm were one-half inch smaller than the right forearm and upper arm. Dr. Alameda was of the opinion that this was due to the fact that the right arm was the dominant arm. While Dr. Alameda took no empirical data on claimant's left hand during the 1983 examination, he noted that the condition of claimant's hand was essentially the same as it was in 1980.

The purpose of a proceeding under section 19(h) is to determine whether a claimant's disability has "recurred, increased, diminished or ended" since the time of the original decision by the Industrial Commission. (Ill. Rev. Stat. 1979, ch. 48, par. 138.19(h); *Howard v. Industrial Com.* (1982), 89 Ill. 2d 428, 430, 433 N.E.2d 657, 658.) To warrant a modification of an award, the change in claimant's condition must be material. The determination of whether a change has occurred is to be made by the Industrial Commission, whose decision will not be set aside unless it is contrary to the manifest weight of the evidence. *U.S. Steel Corp. v. Industrial Com.* (1985), 133 Ill. App. 3d 811, 816-17, 478 N.E.2d 1108, 1112.

On June 26, 1978, Dr. Novotny found 4 centimeters (1.56 inches) of atrophy of the left upper arm as compared to the right upper arm and 2 centimeters (.78 inches) of atrophy to the left forearm as compared to the right forearm. When these findings are compared with those of Drs. Collins and Alameda in 1983 (approximately ½ inch of atrophy to each portion of the left arm as compared to the right), a conclusive determination of material change is not possible.

On June 26, 1978, Dr. Novotny found claimant's left wrist dorsal flexion (extension) was 20° and that his left wrist palmar flexion (flexion) was 40°. On July 25, 1979, Dr. Richard Cram examined claimant and found 70° of left wrist flexion with 30° of left wrist extension. Dr. Collins, claimant's treating physician since 1981, testified in 1983 that

claimant's left wrist flexion was 30° and that his left wrist extension was 15°. Although it is apparent that Dr. Alameda took such measurements, the record contains no basis for comparison between his findings and those of the other doctors. If one compares Dr. Cram's findings with those of Dr. Collins, it appears that claimant's condition had worsened considerably. If, however, one compares Dr. Novotny's findings with Dr. Collins', it appears that claimant's condition worsened only slightly.

The medical evidence regarding the claimant's fingers on the left hand was as follows: Dr. Novotny recognized the existence of "flexion contractures." Although Dr. Cram's examination on July 25, 1979, disclosed full flexion of all finger joints, he noted that the second finger lacked 20° extension, the third and fourth fingers lacked 10° extension, and the little finger lacked 10° extension at the distal interphlangeal joint. Dr. Collins' examination of claimant's fingers revealed that flexion of the second, third, and fourth fingers was 10°; that flexion of the second, third, and fourth fingers was limited to between 5° and 10°; and that extension of the little finger was limited to 25°. Dr. Alameda took no such measurements. Once again, if Dr. Cram's findings are compared with Dr. Collins', claimant's finger mobility appears to have worsened since the original injury. However, if Dr. Novotny's finding that "flexion contractures" existed is compared with Dr. Collins' findings, it would appear that claimant's condition worsened slightly if at all.

■■■ After reviewing the foregoing evidence, we conclude that the Industrial Commission's original determination that claimant's condition had not materially worsened was not contrary to the manifest weight of the evidence.

The judgment of the circuit court of Peoria County is therefore reversed and the award of additional compensation pursuant to the order of such court is set aside.

Reversed.

BARRY, P.J., and McCULLOUGH, McNAMARA, and WOODWARD, JJ., concur.